AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio



In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

CELLULAR TELEPHONE
937-430-7802

)
)
)
)
)
)

Case No. 3:19 mj 537

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-4

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-4

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 846 | conspiracy to distribute controlled substances |
| 21 USC s. 841(a)(1) | possession with intent to distribute controlled substances |
| 21 USC s. 843(b) | use of telephone communication facility |

The application is based on these facts:

See Attached Affidavit of Austin Roseberry

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Austin Roseberry, Special Agent of the DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __9-6-19__

_____
*Judge's signature*

City and state: __Dayton, Ohio__

Sharon L. Ovington, US Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE USE OF A CELL-SITE SIMULATOR TO LOCATE THE CELLULAR DEVICES ASSIGNED CALL NUMBERS (404) 310-5033, (937) 251-1226, (937) 414-4151, (937) 430-7802, (937) 603-1390, AND (937) 369-5440 | Case No. _____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Austin M. Roseberry, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrants under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call numbers: **(404) 310-5033 (UM 5033), (937)251-1226 (UM1226), (937) 414-4151 (UM 4151), (937) 430-7802 (POPE Phone), (937) 603-1390 (WILLIAMS Phone),** and **(937)369-5440 (ALLEN Phone)** (together "**Target Telephones**"), which are described in Attachments A1, A2, A3, A4, A5, and A6. The **Target Telephones** location information to be seized is described herein and in Attachments B-1 through B-6.

2.      I am a Special Agent of the Drug Enforcement Administration (DEA), assigned to the Dayton Resident Office. As such, I am an "investigative or a law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 801, et. sec., and Title 18, United States Code, Section 2516.

3.      I have participated in numerous narcotics investigations during the course of which I have conducted physical and wire surveillance, executed search warrants, and reviewed and analyzed recorded conversations and records of drug traffickers.  Through my training, education, and experience (including debriefing cooperating drug traffickers, monitoring wiretapped conversations of drug traffickers, and conducting surveillance on numerous occasions of individuals engaged in drug trafficking), I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, the various ways drug money is laundered, and the efforts of persons involved in such activities to avoid detection by law enforcement.

4.      I have participated in the investigation and prosecution of complex narcotics enterprises, including major narcotics organizations.  These investigations included the use of court-ordered eavesdropping. I have also conducted extensive analyses of telephone billing records for telephones used by narcotics traffickers.  Members of the Dayton Resident Office also have extensive experience in narcotics investigations, especially involving high-level narcotics traffickers and money launderers.  I have had and continue to have conversations with them concerning this and other narcotics related investigations. I have worked on surveillance and enforcement teams working in conjunction with court authorized T-III intercepts. I have worked as a monitor, listening to T-III intercepts, determining minimization of intercepts, and directing surveillance and enforcement teams to take action based on T-III intercepts that I monitored.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846 and 21 U.S.C. § 843(b) have been committed, are being committed, and will be committed by Crawford Bogle, Savon Pope, and the users of the **Target Telephones.** There is also probable cause to believe that the location information described in Attachments B-1 through B-6 will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

7.     This investigation is currently targeting a Drug Trafficking Organization (herein after referred to as "DTO") that collects, transports, and distributes bulk United States Currency (hereafter referred to as "USC") that represent the proceeds of drug trafficking activity.  As detailed more fully below, I am aware that Crawford BOGLE ("BOGLE") serves an integral role in this DTO and distributes bulk amounts of fentanyl and methamphetamine on its behalf in the Dayton, Ohio area.

8.     BOGLE has a history of drug trafficking activity.  During in or around October 2013, he pleaded guilty to a federal drug charge in the United States District Court for Southern District of Ohio and ultimately received a 70 month term of imprisonment in that case.  During the investigation of that matter, law enforcement recovered quantities of cocaine, crack cocaine, and marijuana.  BOGLE has additional contacts with the criminal justice system, including:

burglary, bribery, menacing, possession of drugs, possession of cocaine, permitting drug abuse, and possession of drug paraphernalia.

9.      On May 22, 2019, members of the Dayton RO conducted mobile surveillance of BOGLE wherein BOGLE drove from 4492 Riverside Drive, Dayton, OH to the Cincinnati Airport. At this time, members of the Dayton RO secured a search warrant for 4492 Riverside Drive, Dayton, OH. As a result of the execution of this search warrant, a total of approximately 1,061 grams of suspected fentanyl and approximately 2,390 grams of suspected methamphetamine were recovered from that location.

10.     On or about July 29, 2019, the Honorable Walter H. Rice, United States District Court Judge, authorized the interception of wire and electronic communications over BOGLE's phone – namely, (937)610-8200 (TARGET TELEPHONE #1). Pursuant to that order, law enforcement has intercepted BOGLE on that phone since on or about July 30, 2019. Since the start of interception, law enforcement has monitored several calls involving suspected drug trafficking activity, including between BOGLE and the users of the **Target Telephones**.

11.     For instance, on or about August 5, 2019 at approximately 3:40 p.m., BOGLE received an incoming call at TARGET TELEPHONE #1 from an unknown male caller using 937-251-1226 ("UM-1226"). Toll records for TARGET TELEPHONE #1 confirm this contact with 937-251-1226. Pursuant to the court authorized interception of TARGET TELEPHONE #1, DEA monitored the conversation between BOGLE[1] and UM-1226, which is detailed below:

---

[1] DEA has listened to recorded calls that BOGLE made while in custody on his 2012 federal drug case. DEA also has interviewed BOGLE on prior occasions. From these prior interactions, as

| BOGLE: | [ASIDE: Get all the [unintelligible ("U/I")]. Hello? |
|---|---|
| UM-1226: | Bro'. |
| BOGLE: | What up, bro'? |
| UM-1226: | It's thirty-one (31) five (5) it worked out for you, bruh', if you grab two (2) of 'em, bruh'. |
| BOGLE: | Shit, that ain't gonna work, I told you, boy, I got sixty (60). |
| UM-1226: | I know, I know, I know.  Okay. |
| BOGLE: | A'ight. |

Based on my training and experience, and my knowledge of this case, I know that UM-1226 contacted BOGLE and offered to sell him two kilograms of some type of controlled substance. UM-1226 requested $31,500 for each kilogram (or a total of $63,000).  BOGLE responded that UM-1226 knew that arrangement would not work because BOGLE only had $60,000 available to purchase the two kilograms.  UM-1226 then indicated that he understood.  Although BOGLE and UM-1226 – unknown source of supply -- could not reach an agreement on the 2 kilograms drug sale, this conversation nevertheless demonstrates that BOGLE has sufficient cash – namely, $60,000 -- to purchase bulk quantities of controlled substances.

12.     On or about August 7, 2019 at approximately 8:35 p.m., BOGLE received an incoming call at TARGET TELEPHONE #1 from an unknown male caller using 404-310-5033 ("UM-5033").  Toll records for TARGET TELEPHONE #1 confirm this contact with 404-310-

---

well as reviewing the prior recorded calls, DEA recognized BOGLE's voice on the calls described throughout this document.

5033. Pursuant to the court authorized interception of TARGET TELEPHONE #1, DEA

monitored the conversation between BOGLE and UM-5033, which is detailed below:

| | |
|---|---|
| BOGLE: | Hello? |
| UM-5033: | Yeah, bruh', this shit. I dunno', bruh', this shit… this shit ounced [PH] up now. So I dunno'… This was the same shit you gave me, bro'. That's the, the half that I picked up from you, bro'. |
| BOGLE: | Man… I mean, it's supposed to be [U/I], bruh'. |
| UM-5033: | Shit, it's short two and a half (2.5). |
| BOGLE: | Man, man I dunno' what to say. |
| UM-5033: | Yeah, yeah. |
| [VOICES OVERLAP] | |
| BOGLE: | [U/I] play with you. I ain't gonna play witcha'. [U/I]. I promise you, man, I really [U/I] play with you. Where you have it at? |
| UM-5033: | Man, that's all, man. |
| BOGLE: | What happened? |
| UM-5033: | I knew I shouldn't even bought this weak ass shit, I knew this shit was funny, bruh'. |
| BOGLE: | It ain't funny, I'm buyin' another one (1). |
| UM-5033: | Oh, a'right, bruh'. |
| BOGLE: | A'ight. |

Based on my training and experience, and my knowledge of this case, I know that UM-5033

appears to be an unknown drug dealer who purchases bulk quantities of drugs from BOGLE and

his organization. Specifically, UM-5033 called BOGLE to complain about the quality and

quantity of drugs that he (UM-5033) had acquired from BOGLE. For instance, UM-5033 complained that BOGLE had failed to deliver all of the drugs promised and that the sale was two-and-half ounces short of their agreed upon transaction. UM-5033 also criticized the quality of the drugs, noting that he should not have purchased "this weak ass shit" from BOGLE. BOGLE, however, sought to reassure UM-5033, indicating that he (BOGLE) planned to purchase more of the drugs himself. In making this representation, I believe that BOGLE was attempting to reassure UM-5033 concerning the quality of BOGLE's product. Moreover, this call confirmed that BOGLE continues to acquire bulk amounts of drugs for resale from an as-yet-identified source of supply. Your affiant reviewed the subscriber information for UM5033 which revealed the device was subscribed to Rush Star at 133 Luckie ST NW, Atlanta, GA 30303. Your affiant reviewed public records databases which revealed there is no one named Rush Star associated with 133 Luckie ST NW, Atlanta, GA 30303.

13. On August 12, 2019, at 3:03 P.M., investigators intercepted a call from BOGLE utilizing the TARGET TELEPHONE #1 to an unknown male voice utilizing UM4151. The call is transcribed below:

| | |
|---|---|
| UM4151: | Hello. |
| BOGLE: | Boy you owe me fifteen (15) boy. |
| UM4151: | Huh? |
| BOGLE: | You owe me on that. |
| UM4151: | For what? |
| BOGLE: | For a G. |
| UM4151: | Damn [U/I], alright. |

Based on my training and experience, I believe BOGLE was calling the male voice utilizing UM4151 to remind the unknown male that he still owes BOGLE a drug debt for a "G". Prior to this call, UM4151 called BOGLE on the TARGET TELEPHONE # and asked in coded language for drugs. A review of subscriber information for UM4151 revealed the device is subscribed to No Name at 6500 Emerald PY, Apartment 310, Dublin, Ohio.

14.     On or about August 7, 2019, at approximately 3:06 p.m., BOGLE received an incoming call on TARGET TELEPHONE #1 from SAVON POPE, who was utilizing the POPE Phone. Toll records confirm the contact between TARGET TELEPHONE #1 and the POPE Phone. Pursuant to the court authorized interception of TARGET TELEPHONE #1, DEA monitored the conversation between BOGLE and POPE, the pertinent portions of which are detailed below:

| | |
|---|---|
| POPE: | Yeah, you can tell [U/I] [MUMBLES] I must of not have it [U/I]. That nigga' [U/I] shit nasty boy. |
| BOGLE: | That mother fucker nasty. |
| POPE: | Sweet as fuck boy, that shit is crazy. You know who he had wrappin' shit? |
| BOGLE: | They were tryin' buy your Caddy. He like man I'm gonna' wrap it same color. That's the same wrap on your shit, on your truck ain't it? |
| POPE: | Doesn't look like that. |
| BOGLE: | Call that nigga', I said man that got that shiny [U/I] truck. |
| POPE: | Yup. |
| BOGLE: | What color you want on the Cat, on the trac[phonetic]? |
| POPE: | [U/I]. |
| BOGLE: | You want the black one? |

POPE:        But uh..I like the blue for real.

BOGLE:      That blue?

POPE:        Yeah, I like that bitch for real

BOGLE:      Ey you know it, you probably just have to wrap it [U/I] man.

POPE:        [U/I] to the ground, put the nigga' down.

BOGLE:      You ready?

POPE:        Who me?

BOGLE:      Yeah.

POPE:        Yeah.
BOGLE:      I gotta drive baby...  I gotta hit the play and shit bro.

POPE:        What play?

[AUDIO GLITCH]

BOGLE:      Huh?

POPE:        What play bro.

BOGLE:      I got a little play. You got some money laying around? So the mother
            fucker  can go grab a few.

POPE:        I got that money from last night.

BOGLE:      That ain't no money.

POPE:        I think seven thousand (7000).

BOGLE:      Talkin' ' bout like some real money layin' around.

POPE:        For what?

BOGLE:    Go grab these three (3) for ninety (90).

POPE:     Huh?

BOGLE:    Go grab these three (3) for ninety (90).

POPE:     For that old girl?

BOGLE:    Yeah.

POPE:     [U/I] try to turn me on like that too.

BOGLE:    What turn you on nigga'? Hey bruh, I think, I think you owe some shit down there in service.

POPE:     Huh?

BOGLE:    I think you owe some shit at service bro.

POPE:     I do.

BOGLE:    That's why you get [U/I].

POPE:     I do, a couple dollars.

BOGLE:    How much?

POPE:     But uh. But uh [MUMBLES]... I don't know, not that much.

BOGLE:    Probably seven (7) or five (5).

POPE:     Seven (7) or five (5)?

BOGLE:    You gonna' take this rental back late too man, they gotta have this car in a day man. Blacked out and everything. I just make it happen, put that price on their ass. I need you with me.

POPE:     So you want me to pull up on you now?

BOGLE:     Yeah, I gotta get bruh ready 'cause we may get a little play.

POPE:      Oh.

BOGLE:     So bring some money with you, bring some money with you too so we can make this deal happen.

POPE:      I'm bringin' that money that you gave me last night, that's all I got on me.

BOGLE:     Alright.

Based on my training and experience, as well as my familiarity with the facts of this case, I know that, during the above-described call, POPE and BOGLE discuss a future drug transaction in which BOGLE asked POPE if POPE had any money laying around, presumably to help purchase the drugs. POPE responded that he has $7000, and BOGLE replied that he was looking for real money, indicating that $7000 was not enough. BOGLE indicated that he was looking to purchase three (3) for ninety (90). POPE asked BOGLE if he needed the money for old girl, and BOGLE confirmed. I know that, based on my training and experience, cocaine, which is often referred to as "girl", is currently in the price range of thirty-thousand per kilogram. Therefore, I believe that BOGLE hoped to acquire with POPE's monetary help three kilograms of cocaine for $90,000.

15.     During the early evening of August 8, 2019, DEA continued to maintain surveillance in the area of the Marathon residence. During that time, agents observed BOGLE repeatedly drive from the Marathon residence and then return to that location.

16.     On that evening at approximately 8:38 p.m., BOGLE placed at outgoing call from TARGET TELEPHONE #1 to WILLIAMS at WILLIAMS Phone. Toll records for TARGET TELEPHONE #1 confirm this contact with WILLIAMS Phone. Pursuant to the court authorized

interception of TARGET TELEPHONE #1, DEA monitored the conversation between BOGLE and WILLIAMS, a portion of which is detailed below:

| | |
|---|---|
| WILLIAMS: | Hello? |
| BOGLE: | Boy, it's hot as a mother fucker, bro', I keep seein' the D's. |
| WILLIAMS: | Around where? |
| BOGLE: | Ridin' past me, bruh. |
| WILLIAMS: | What you thinkin'? |
| BOGLE: | I don't know, boy, that's the Feds ain't it? That's the Feds, [U/I], white pick up truck. When was we together, bruh? I was tellin' you… Wasn't I telling you about some D's or summin'? |
| WILLIAMS: | Nah, you ain't never tell me about no D's. [PAUSE] You hear me? |
| BOGLE: | Yeah. |
| WILLIAMS: | Where you at? You on Marathon? |
| BOGLE: | Yeah, I was. They rode past there bro', sittin' down the street watchin' that. Watching me down there. |
| WILLIAMS: | Damn. |

[VOICES OVERLAP]

| | |
|---|---|
| BOGLE: | Motha' fuckin'… |
| WILLIAMS: | D's they're trying to [U/I]. |
| BOGLE: | D's, every time I'm ridin' down Main street they comin' up Main street. |
| WILLIAMS: | You know it's them? |
| BOGLE: | Man, I know it's them. I ain't stupid, [U/I] mother fuckin' same car. I keep seein' another same car, I'ma know her. They tricked me like that boy, I know these… |

WILLIAMS:      Hell naw, better not let 'em either.

BOGLE:         I'm tryina' see who the fuck I got on my line.

WILLIAMS:      You hear me?  [U/I] I'm sayin' who all you gonna hit today? Better be somebody from today. [AUDIO BREAKS] If you [AUDIO BREAKS] kinda like that.

BOGLE:         I don't know.

WILLIAMS:      White boy. [BACKGROUND NOISE] Drive.

BOGLE:         Go to the drive man, for a little bit.

WILLIAMS:      You gonna drive on it?

BOGLE:         Yup. Man, just keep your eye open for a black Silverado man, blue or with the, with the, with the O, like the, like the work truck rims on it. Work truck rims like, like the factory, like the factory would put on there. Look funny, look, look like a police car, like police wheels on it.  You feel me?  On a big Silverado, bruh'.

WILLIAMS:      Ten and a half (10.5) way down the windshield.

BOGLE:         You need to clean up your shit too, bruh'. You hear me?

WILLIAMS:      Hell yeah. [U/I] here. That's why, God damn it boy, that's why I got over that side of town, boy. That was kind a real funny.

BOGLE:         I might just, I might just chill out, boy, I might just chill out, be cool.

WILLIAMS:      [U/I] Go out of town for couple weeks but [U/I].

BOGLE:         My wife should get me a job or something real quick. I ain't really makin' no, [AUDIO BREAKS] I ain't makin' no money, you feel me?

WILLIAMS:      Yeah.

BOGLE:         I was tryin' to waitin' on my shit to pick up so I can, you know start to get some free money.

WILLIAMS:      Let somebody else work it.

BOGLE:         Nah.

WILLIAMS:      You got time.

                                ***

BOGLE:         They on uh, nogga', you ain't seen that black Silverado?

WILLIAMS:      [MUFFLED]  Uh-uh.

BOGLE:         Black Silverado like Twan [PH] had with them headlights, but they
               got the like the police, the police wheels on it like, like some shit
               that the police car would have on it.  That's like, that's what's
               gonna throw the, the black Silverado off the wheels, you feel me?
               Got the lil' punk ass tool box in the back, small one, like the shit in
               the bed, but it's black.  and a, and a van like Day Day's, with the
               [U/I] on it.

WILLIAMS:      What color is the Caravan?

BOGLE:         Like a dark charcoal grey.

WILLIAMS:      [GRUNTS]

BOGLE:         [U/I].

WILLIAMS:      Huh?  It's this one.

[BACKGROUND: CONVERSATION/ STATIC]

BOGLE:         [ASIDE: Man, let's move this shit, bruh'.  Take my truck and
               move all that shit, bro'.  I dunno' what [U/I].  Need to put it, but
               let's just put it up, bro'.  That's all, shit, that's all I'm nervous
               about, boy.  That's all I got, boy.  [AUDIO BREAKS] [U/I] one,
               one I'm workin' on.  This one, [U/I] that money.  Count it real
               [U/I].  Get it and count it real quick.  [BACKGROUND: UM:
               Man, it's [U/I].] [U/I].]

WILLIAMS:      Huh?

| | |
|---|---|
| BOGLE: | Tay. |
| WILLIAMS: | Yeah. After you, bruh'. |
| BOGLE: | Damn, boy, it's on, bruh', you hear me? Damn, they tryina' lock a nigga up. |
| WILLIAMS: | You feel it like that? |
| BOGLE: | Nigga, they followin' me, bruh'. Look, bruh', I go down Marathon, pull up at Wheatley [PH]. [BACKGROUND: CONVERSATION] [ASIDE: I'll go down there, man.] Listen, listen, man, I'm motha' fuckin' goin' down Marathon, I'm pullin' in, I'm in, sittin' in front of the apartment building. I see the grey van go up Linda Vista, turn from the good neighborhood go, turn right there on Linda Vista. Damn, that's that same motha' fuckin' van. |

Based on my training and experience, as well as my familiarity with the facts of this case, I know that, upon observing surveillance units around the Marathon residence, BOGLE contacted WILLIAMS. In doing so, BOGLE noted that he seen what he believed to be a "D" or detective parked in a Silverado truck near the Marathon residence. (Notably, around that time, one of DEA's surveillance units was in a pick-up truck). BOGLE indicated that he might need to "chill" or slow down his illegal drug sales. He further opined that he could ask his wife to find him legitimate employment – presumably as a means to conceal his continued drug trafficking. Finally, while on the call with WILLIAMS, but apparently speaking to someone physically in his (BOGLE's) presence, BOGLE indicated that he needed to take his truck and move "this shit" – namely, go to current stash houses, remove any drugs hidden there, and move them to new locations.

17.     On August 18, 2019, approximately 3:32 p.m., BOGLE received an incoming call on the TARGET TELEPHONE #1 from LaJuan ALLEN on the ALLEN Phone. Toll records for TARGET TELEPHONE #1 confirm this contact with ALLEN Phone. Pursuant to the court

authorized interception of TARGET TELEPHONE #1, DEA monitored the conversation

between BOGLE and ALLEN, a portion of which is detailed below:

ALLEN:     You been smokin'?

BOGLE:     Yeah, I got some Gushers.

ALLEN:     You got some [U/I]?

BOGLE:     Nah, this is Gushers boy, that shit fire.

ALLEN:     Uh—You got it from down there?

BOGLE:     [U/I].

ALLEN:     All right, just checkin' with you. I thought you just had some [U/I]…

                              [VOICES OVERLAP]

BOGLE:     I'm cool with that shit. I'm cool with that shit.

ALLEN:     Man, I told you, my nigga is goddamn gettin' on that motherfucker with
           ice, every time bro'.

BOGLE:     Damn.

ALLEN:     Five (5) keys every time, bro'.

BOGLE:     Damn.

ALLEN:     [LAUGHS]. He doin' [U/I] shit. This fuckin' [U/I] he was tellin' me some
           shit, bro'. He coming through with that shit in his luggage, every fuckin'
           time, five (5) keys, bro'.

BOGLE:     That nigga is crazy.

ALLEN:      Man shit, I told that nigga, boy.

BOGLE:     Yeah [U/I].

Based upon training and experience, your affiant believes ALLEN is describing to BOGLE how

ALLEN's source of supply/associate is bringing kilograms of methamphetamine (ice) in the

unnamed sources luggage. Your Affiant has reviewed subscriber information for the ALLEN Phone which revealed the device is subscribed to Mike Hill at 2809 Salem Avenue, Dayton, Ohio, 45406-2733. Your affiant believed this is fictitious subscriber information based on a number of phones including the TARGET TELEPHONE #1, POPE Phone and ALLEN Phone all utilizing the same subscriber address.

18. Based on the aforementioned information, I believe the **Target Telephones** are being utilized to facilitate the BOGLE Drug Trafficking Organization in violation of Title 21 U.S.C 846 and 841 (a)(1). The location of the **Target Telephones** would aid in the identification of the unknown male voices utilizing these devices and or locate the residences of known members of the BOGLE DTO. Based on my training and experience, I know that individuals involved in the drug trade frequently utilize fictitious subscriber information in an effort to thwart law enforcement detection.

19. Based on my training and experience, I know that Verizon , Sprint and AT&T can collect cell-site data about the **Target Telephones**. Verizon , Sprint and AT&T can also collect E-911 Phase II data about the location of the **Target Telephones**, including by initiating a signal to determine the location of the **Target Telephones** on T-Mobile USA's network or with such other reference points as may be reasonably available. I know that this location information will assist law enforcement to identify the user of the **Target Telephones**. Additionally, the location information may also lead law enforcement to locations at which the users of the **Target Telephones** are storing or selling illegal drugs. Additionally, this information will assist law enforcement to observe potential meetings between the users of the **Target Telephones** and other individuals with whom he/she is trafficking narcotics, *i.e.*, coconspirators.

## MANNER OF EXECUTION

20.     Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

21.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrants to delay notice until 30 days after the collection authorized by the warrants has been completed.  This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrants may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscribers or users of the **Target Telephones** would seriously jeopardize the ongoing investigation, as such a disclosure would give those persons an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. Moreover, to the extent that the warrant authorizes the seizure of any tangible property, any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.

22.     I further request that the Court direct Verizon , Sprint and AT&T to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Verizon , Sprint and AT&T.  I also request that the Court direct Verizon , Sprint and AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference Verizon , Sprint and AT&Ts' services, including by initiating a signal to determine the location of the **Target Telephone** on Verizon , Sprint and AT&Ts' network or with such other reference points as may be reasonably available,

and at such intervals and times directed by the government.  The government shall reasonably compensate Verizon , Sprint and AT&Ts' for reasonable expenses incurred in furnishing such facilities or assistance.

23.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Telephones** outside of daytime hours.

24.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Austin M. Roseberry
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
On: 9 - 6 - 19

HONORABLE SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

**Property to Be Searched**

1. The cellular telephone assigned call number (404-310-5033) ("**UM5033**"), whose service provider is AT&T, a company headquartered at West Palm Beach, Florida.

2. Information about the location of the **Target Telephone** that is within the possession, custody, or control of AT&T.

## ATTACHMENT A-2

1.  The cellular telephone assigned call number (937-251-1226) ("**UM1226**"), whose service provider is Sprint, a company headquartered at Lenexa, Kansas.

2.  Information about the location of the **Target Telephone** that is within the possession, custody, or control of Sprint.

———————————————

**ATTACHMENT A-3**

1. The cellular telephone assigned call number (937-414-4151) ("**UM4151**"), whose service provider is Verizon, a company headquartered at Basking Ridge, New Jersey.

2. Information about the location of the **Target Telephone** that is within the possession, custody, or control of Verizon.

————————————

## ATTACHMENT A-4

1.  The cellular telephone assigned call number (937-430-7802) ("**POPE Phone**"), whose service provider is AT&T, a company headquartered at West Palm Beach, Florida.

2.  Information about the location of the **Target Telephone** that is within the possession, custody, or control of AT&T.

————————————————

## ATTACHMENT A-5

1.  The cellular telephone assigned call number (937-603-1390) ("**WILLIAMS Phone**"), whose service provider is Sprint, a company headquartered at Lenexa, Kansas.

2.  Information about the location of the **Target Telephone** that is within the possession, custody, or control of Sprint.

_____

## ATTACHMENT A-6

1. The cellular telephone assigned call number (937-369-5440) ("**ALLEN Phone**"), whose service provider is AT&T, a company headquartered at West Palm Beach, Florida.

2. Information about the location of the **Target Telephone** that is within the possession, custody, or control of AT&T.

## ATTACHMENT B-1

### Particular Things to be Seized

All information about the location of **Target Telephone** described in Attachment A-1 for a period of thirty days, during all times of day and night. "Information about the location of **Target Telephone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-1.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government. In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the **Target Telephone** on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).

**ATTACHMENT B-2**

**Particular Things to be Seized**

All information about the location of **Target Telephone** described in Attachment A-2 for a period of thirty days, during all times of day and night. "Information about the location of **Target Telephone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-2.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **Target Telephone** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).

**ATTACHMENT B-3**

**Particular Things to be Seized**

All information about the location of **Target Telephone** described in Attachment A-3 for a period of thirty days, during all times of day and night. "Information about the location of **Target Telephone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-3.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon, Verizon is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of the **Target Telephone** on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).

## ATTACHMENT B-4

### Particular Things to be Seized

All information about the location of **Target Telephone** described in Attachment A-4 for a period of thirty days, during all times of day and night. "Information about the location of **Target Telephone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-4.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government. In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the **Target Telephone** on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).

## ATTACHMENT B-5

### Particular Things to be Seized

All information about the location of **Target Telephone** described in Attachment A-5 for a period of thirty days, during all times of day and night.  "Information about the location of **Target Telephone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-5.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government.  In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **Target Telephone** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure.  *See* 18 U.S.C. § 3103a(b)(2).

## ATTACHMENT B-6

### Particular Things to be Seized

All information about the location of **Target Telephone** described in Attachment A-6 for a period of thirty days, during all times of day and night. "Information about the location of **Target Telephone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-6.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government. In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the **Target Telephone** on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).